UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/8/22
```

————————————————————————x

UNITED STATES OF AMERICA,

    -         against-

                                     22 CR 334 (CM)

JOSE AGUILA CARRASCO,

             Defendant.

————————————————————————x

## DECISION AND ORDER DENYING DEFEDNANT'S MOTION TO SUPPRESS

McMahon, J.:

      Jose Aguila Carrasco ("Carrasco") is charged in the instant Indictment—together with codefendants Bianca Acuna and Robert Morrell—with narcotics trafficking conspiracy. Before the Court is Carrasco's motion to suppress evidence seized from his cellphone pursuant to a court authorized search warrant.[1]

      Background

      On May 31, 2022, Magistrate Judge Barbara Moses authorized the Complaint charging Aguila Carasco and his co-defendants with conspiring to traffic fentanyl and cocaine in violation of 21 U.S.C. § 846. As part of the Complaint, the DEA special agent on the case swore out an affidavit that described, among other things, his background knowledge regarding the trafficking of fake oxycodone pills commonly laced with fentanyl, how the DEA had arranged to purchase fentanyl and cocaine from the Organization, and how the

---

[1] The defendant had also moved to have his trial severed from Acuna's trial. However, Acuna has since entered a plea of guilty, rendering any severance motion moot.

defendants had been identified as trafficking fentanyl and cocaine for the Organization. Compl ¶¶ 5-6. Relevant to the instant motion, the Complaint did not rely on post-arrest statements Acuna made to law enforcement, in order to establish probable cause for the charges.

According to complaint:

In late May 2022, the defendant and two co-conspirators were arrested while trafficking roughly 14 kilograms of narcotics—11 kilograms of fentanyl and three kilograms of cocaine— into Manhattan. Criminal Complaint ¶ 6(i)-(k). In the weeks leading up to the arrests, a confidential source (the "CS") working for the Drug Enforcement Administration ("DEA") posed as a purchaser of large quantities of narcotics and arranged to purchase the fentanyl and cocaine from a drug trafficking organization based in Mexico (the "Organization"). Compl. ¶ 6(a)-(b). The CS conferred with members of the Organization about the deal by phone and during a visit to Phoenix, Arizona, where the CS met in person with Aguila Carrasco's co-defendant, Bianca Acuna. Compl. ¶ 6(a)-(b). Ultimately, the Organization agreed to sell the fentanyl and cocaine to the CS, for approximately $872,000. Compl. ¶ 6(b).

After transportation delays, the narcotics arrived in New York on May 28, 2022 by car. The CS and Acuna spent several hours together in downtown Manhattan waiting for the car to arrive. Compl. ¶ 6(f). The CS surreptitiously recorded his conversation with Acuna during that wait, and the recording shows that Acuna made numerous statements about her involvement in narcotics trafficking. Compl. ¶ 6(f).

Acuna and the CS were not alone downtown while they waited for the narcotics to

2

arrive. DEA agents conducting surveillance of their meeting noticed the lingering presence of the defendant, who was waiting nearby. Compl. ¶ 6(g).

At approximately 7:15 PM, a red Jeep Grand Cherokee driven by co-defendant Robert Morrell pulled up near the location where the CS, Acuna, and the defendant were all waiting. Compl ¶ 6(h). Agents observed the defendant go to the Jeep, unload a brown cardboard box from the trunk, and get into the CS's car with the box. Compl. ¶ 6(i).

An audio recorder captured portions of what unfolded inside the CS's car. The defendant opened the box to show the CS the drugs packed inside. Compl ¶ 6(i). The defendant confirmed, twice, that the box contained the "buttons," a term that the agents, based on their training and experience, understand refers to the pressed fentanyl pills the Organization was in the process of selling to the CS. Compl. ¶ 5(d); Exhibit ("Ex.") A at 2, 5. The defendant, Acuna, and Morrell were all then arrested. Incident to the arrests, phones were seized from all three defendants. Agents also seized the box from the defendant and subsequently confirmed it contained approximately 100,000 fentanyl pills (later found to weigh approximately 11 kilograms) and three one-kilogram bricks of cocaine. Compl. ¶ 6(j)-(k).

According to the Government: After the arrests, the agents processed the defendants at the DEA office in Manhattan. In the course of this process, the DEA agents read the defendants their *Miranda* rights and gave them the opportunity to speak with the agents, if they so wished. The defendant declined to be interviewed, but Acuna voluntarily answered some of the agents' questions in a recorded post- arrest interview. The recording shows that Acuna shared the following information, among other things: (i) Acuna was carrying two phones when she was arrested, Ex. B at 6-7; (ii) Acuna used both of her phones. Ex. B at 6-7;

3

(iii) Acuna knew that she was trafficking blue pills, Ex. B at 12- 13; (iv) Acuna was acquainted with Aguila Carrasco, Ex. B at 15; and (v) Aguila Carrasco and Acuna traveled to New York together. Ex. B at 15-18.

*The Phone Search Warrant*

On June 10, 2022, Magistrate Judge Sarah Netburn issued a warrant authorizing the search of three phones, including one seized from the defendant during his arrest. But due to what the Government characterizes as an administrative oversight, the phones were not searched within the 14 days after issuance of the warrant. The Government thus sought a second warrant based on a substantively similar warrant application, with an identical "probable cause" section. On June 24, 2022, Magistrate Judge Sarah L. Cave issued a second warrant.

Both warrants were issued based on facts set forth in an affidavit. The affiant first sets out facts to support probable cause to believe that the defendant, Acuna and Morrell had engaged in narcotics distribution and conspiracy to commit the same, in violation of Title 21, United State Code, Sections 841 and 846. Then the agent set out facts to support probable cause to believe that the three phones contained evidence, fruits and instrumentalities of this conspiracy.

As to the first part, establishing probable cause to believe the defendant and Acuna had engaged in the charged offenses, the affidavit attached and incorporated by reference the full seven-page Complaint charging them with the offense. Garcia Aff. ¶7. The agent also summarized key facts from the Complaint. For instance: (i) approximately 100,000 counterfeit oxycodone pills and three kilograms of cocaine were delivered to Manhattan on May 28,

4

2022; (ii) the defendant was observed waiting at the transaction location for hours before the

narcotics arrived in Manhattan; and (iii) after the narcotics finally arrived, the defendant

retrieved the narcotics from the Jeep and personally delivered them to the CS. Garcia Aff. ¶ 8.

Finally, at the end of the section on the facts supporting the defendant's commission of the

narcotics offense, the agent made the following statement—a portion of which is the subject

of the instant motion, as the defendant contends it was deliberately false or made in reckless

disregard of the truth:

> From participating in the operation, I am aware that after she was
> arrested, ***Acuna gave a statement to law enforcement in which
> she acknowledged that she had traveled to New York with
> Aguila Carrasco to complete the narcotics transaction*** and that
> the two of them were staying at a hotel together.

To support probable cause to believe the defendant's phones would contain evidence,

fruits and instrumentalities of the narcotics trafficking conspiracy, the agent explained that the

phones in question belonged to the defendant and Acuna and had been seized from them while

they were actively trafficking narcotics. Garcia Aff. ¶¶ 10-13. The agent also described some of

the ways that phones had been used by the Organization in this case, and referenced both

communications between Acuna and the CS, and communications between Acuna and her co-

conspirators. Garcia Aff. ¶ 11.

> The agent attested:

> Based on my training and experience and my familiarity with this
> and other narcotics trafficking investigations, I know that
> individuals involved in narcotics trafficking often use cellular
> telephones to discuss and plan narcotics sales and to arrange the
> distribution of narcotics and narcotics sale proceeds.

Garcia Aff. ¶ 15. The agent then went on to describe, based on his training and experience,

why and how cellphones are commonly used in furtherance of narcotics trafficking
conspiracies. Garcia Aff. ¶¶ 14-18. For instance, he attested that cellphones are frequently
used by narcotics traffickers because they can conceal the identity of the user, cellphone
numbers can be swapped easily, and cellphones can be used to send encrypted messages.
Garcia Aff. ¶ 15. He further attested that cellphones are frequently used by narcotics
traffickers to store contact information belonging to co-conspirators and customers, to
communicate with customers, and to keep records of narcotics transactions. Garcia Aff. ¶ 16.
The agent also noted that evidence of trafficking can be recovered from cellphones belonging
to narcotics traffickers "months or even years" after the evidence was first created. Garcia
Aff. ¶ 18.

Defendant's Motion

Carrasco argues that the fruits of the cellphone search should be suppressed because (1)
the agent made a material misrepresentation in the warrant application, and (2) the warrant
itself was overbroad and not supported by probable cause to believe that evidence of a crime
would be found.  In the alternative, defendant asks the Court to hold a hearing pursuant to
*Franks v. Delaware*, 483 U.S. 154 (1978).

The motion to suppress is denied. A *Franks* hearing is unnecessary.

*The Allegedly False Statement*

The defendant contends that a *Franks* hearing is warranted because the affidavit
contained the following allegedly false statement about Acuna's post-arrest interview: "Acuna
gave a statement to law enforcement in which she acknowledged that she had traveled to New
York with Aguila Carrasco to complete the narcotics transaction." Garcia Aff. ¶ 9.  Defendant

6

argues that the statement "falsely claimed that Ms. Acuna had confessed and implicated Mr. Aguila Carrasco." Def. Mot. at 1.

Indeed, the challenged statement in the warrant affidavit—"Acuna . . . acknowledged that she had traveled to New York with Aguila Carrasco to complete the narcotics transaction"—arguably, overstates the inculpatory nature of what Acuna actually told law enforcement. Acuna's answers to the agents' questions were actually more nuanced, as she was clearly trying to talk her way out of getting caught with a box filed with cocaine and fentanyl pills. Acuna denied knowledge of the type of narcotics in her possession, stating that she "just knew it was Viagra and other stuff." Govt. Ex. B at 11. When pressed on her improbable claim that she believed herself to be transporting Viagra, Acuna acknowledged that "[t]hey told me it was some blue pills" and that she was further told that "the youth use that over here" in the United States. Govt. Ex. B at 12. Most important, while Acuna told the agents that she had traveled to New York with Carrasco, she did not exactly say that they traveled to New York with the purpose of "completing a narcotics transaction." When one of the agents asked Acuna, "[T]his man, do you know him? The one right outside? Who is he?"; Acuna's answered: "Yes, I know him. He came with me to New York." Govt. Ex. B at 12. She does not explicitly say that he came to New York with her "to complete a narcotics transaction."

A magistrate reading Agent Garcia's summary of Acuna post-arrest statement might understand it to mean Acuna had unequivocally confessed to narcotics trafficking and had implicated Carrasco in the crime. But even if the challenged statement were stricken from the affidavit, the affidavit still contains sufficient facts to establish probable cause for the search of

7

Carrasco's phone. That is so because the Complaint, which was incorporated by reference into the affidavit, outlines the reason why there was probable cause to believe that the defendant was knowingly involved in a narcotics-trafficking conspiracy. Most notably, the Complaint states that Carrasco was (1) was lingering outside waiting on the delivery vehicle; (2) retrieved the box with the drugs from delivery vehicle when it arrived; (3) carried the box of drugs into the CS's car; and (4) confirmed to the CS that the "buttons" were in the box— all this was incorporated into the agents search warrant affidavit by reference. Since the Complaint does not contain any reference to Acuna's post-arrest statements, it cannot be alleged to suffer the infirmities that the defendant alleges of the warrant.

Under these circumstances, even without the allegedly false statement, the affidavit "by any practical, common sense standard, is sufficient to establish probable cause." *United States v. Gotti*, 771 F. Supp. 535, 542 (E.D.N.Y. 1991). That is, "the magistrate would have had a substantial basis for determining that probable cause existed." *Id.* at 541–42.

### *The Warrant Was Sufficiently Particularized*

The defendant asserts that the warrant was not sufficiently particularized because it did not adequately "link his phone to the crime" and did not limit the seizure of information to a particular timeframe. Def. Mot. at 9-10.

Defendant is wrong.

The agent's affidavit sets forth a sufficient basis for finding there was probable cause that the defendant's phone contained evidence, fruits and instrumentalities of the narcotics offenses. The second half of the affidavit's probable cause analysis sets forth the bases of the agent's knowledge of how, why and the frequency with which drug

8

traffickers use cellphones in furtherance of their conspiracies. *See* Garcia Aff. ¶¶ 14-18.
The defendant attempts to dismiss this account of what the agent's training and
experience investigating narcotics offenses has taught him to expect as mere "boiler
plate language about use of cellphones." Def. Mot. at 8. This argument has been
routinely rejected by courts in this Circuit. *See, e.g.*, *United States v. Barret*, 824 F.
Supp. 2d 419, 448 (E.D.N.Y. 2011) (rejecting defendant's argument that phone warrant
affidavit containing "two boilerplate paragraphs" was insufficiently specific where the
affiant attested that cell phones can store many types of information and that in her
experience individuals involved in narcotics trafficking typically use cellular phones to
communicate and store information).

In support of his argument that the warrant was overbroad for lack of a limiting
timeframe for the contents of his cellphone, Carrasco relies on a narrow interpretation of
the offense conduct set forth in the underlying affidavit and incorporated Complaint:
"There cannot be a determination that there was probable cause to search through years
of Mr. Aguila Carrasco's cellphone data . . . based on a few hours of conduct on a single
day " Def. Mot. at 12. But Carrasco was not suspected of "a few hours of conduct on a
single day." To the contrary, he was suspected of conspiring with Ms. Acuna and others
to traffic over 100,000 pills laced with fentanyl and three one-kilogram bricks of cocaine
across the country, from Arizona to New York. An operation of this scale could be
expected to require extensive planning, communication, and coordination with others—
the evidence of which could be expected to appear on the defendant's phone over a
substantial period. The nature of the conspiracy and the acts taken in furtherance of it

9

matters because, as the courts in this Circuit have repeatedly recognized, "time frame is less relevant to a warrant's breadth where the criminal acts are complex and necessarily extend over a significant period of time." *United States v. Hernandez*, No. 09 CR 625 (HB), 2010 WL 26544, at *9 (S.D.N.Y. Jan. 6, 2010).

Here, a time limitation was not required for the warrant to be sufficiently particularized.

*Good Faith*

Whatever the validity of the challenged search warrant, the good faith exception to the exclusionary rule would prevent suppression in this case.

The "harsh remedy of suppression" is not appropriate where officers show "objectively reasonable reliance" on a search warrant that is subsequently invalidated. *United States v. Pignard*, No. 06 CR 718 CM, 2007 WL 431863, at *7 (S.D.N.Y. Feb. 6, 2007). Such is the case here, where officers relied on a warrant that was issued in substantially the same form by two different magistrate judges and which incorporated all the facts from the Complaint by which the defendant had already been charged.

The defendant argues that the good faith exception is inapplicable because it is not possible for an officer to reasonably believe that a warrant without a time limitation is sufficiently particularized. Def. Mot. at 13. The courts in this Circuit have come to exactly the opposite conclusion. "Since the Second Circuit has never addressed when, if at all, time-frames are a constitutional requirement in business-record search warrants, and district courts in this circuit have not converged upon a clear rule, the Court cannot say that 'a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Cohan*, 628 F. Supp. 2d 355, 367 (E.D.N.Y. 2009). Indeed,

10

the courts have sometimes declined to decide whether the lack of temporal limitations renders a warrant unconstitutionally overbroad in favor of holding simply that "the executing officers acted in good-faith reliance" on the warrant. *United States v. Rosario*, No. 19-CR-807 (LAP), 2021 WL 5647879, at *1 (S.D.N.Y. Dec. 1, 2021).

The defendant has offered no evidence to suggest reliance on the warrant in this case could be deemed objectively unreasonable or in bad faith. *United States v. Lewis*, 2012 WL 1142305, at *2 (rejecting suppression in the absence of evidence that law enforcement's reliance on warrant was objectively unreasonable or in bad faith).

Defendant's motions to suppression is denied—a *Franks* Hearing is unnecessary.

December 8, 2022

Colleen McMahon
United States District Court Judge

11